UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB and FRIENDS OF THE WEST SHORE,<br><br>          Plaintiffs,<br><br>     v.<br><br>TAHOE REGIONAL PLANNING AGENCY,<br><br>          Defendant. | No.  2:13-cv-00267 JAM EFB<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

This matter is before the Court on Plaintiffs Sierra Club and Friends of the West Shore's (collectively "Plaintiffs") Motion for Summary Judgment (Doc. #25) and Defendant Tahoe Regional Planning Agency's ("TRPA") ("Defendant") Cross Motion for Summary Judgment and Opposition (Doc. #36).  Plaintiffs opposed Defendant's cross motion (Doc. #41) and Defendant replied (Doc. #45).  Oral argument on these motions was held before the Court on March 26, 2014.

   I.   UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND

   In 1968, California and Nevada entered into the Tahoe

1

1  Regional Planning Compact (the "Compact") to protect the Lake
2  Tahoe Area Basin ("LTAB").  Defendant's Response to Plaintiffs'
3  Statement of Undisputed Facts ("DRUDF") (Doc. #36-3) ¶ 18.  The
4  Compact created the Tahoe Regional Planning Agency ("TRPA" or
5  "Defendant") to serve as the land use and environmental resource
6  planning agency for the region.  DRUDF ¶ 18.  In 1980, Nevada and
7  California extensively amended the 1969 Compact.  DRUDF ¶ 19.
8  The amended Compact requires TRPA to develop environmental
9  threshold carrying capacities, and to ensure that all planning
10 and development in the LTAB region is consistent with achieving
11 and maintaining these thresholds.  DRUDF ¶ 20.  A "threshold" is
12 "an environmental standard necessary to maintain a significant
13 scenic, recreational, educational, scientific, or natural value
14 of the region or to maintain public health and safety within the
15 region."  Compact, Art. II(i).  In 1987, TRPA enacted the
16 Regional Plan, which has guided all land-use planning and
17 development within the LTAB region.  Plaintiffs' Response to
18 Defendant's Statement of Undisputed Facts ("PRUDF") (Doc. #41-1)
19 ¶ 26.  The TRPA Code of Ordinances ("Code"), which implemented
20 the 1987 Regional Plan, was adopted in May 1987.
21      Under the Code, TRPA may not amend the Regional Plan unless
22 it finds that the Plan, "as amended, achieves and maintains the
23 thresholds."  Code § 4.5, at AR668.  Article VII of the Compact
24 requires TRPA to prepare and consider a detailed Environmental
25 Impact Statement ("EIS") before approving or carrying out any
26 project that may have significant effect on the environment.
27 Compact, Art. VII(a)(2).  The EIS must include the project's
28 significant environmental impacts, any significant adverse

environmental effects that cannot be avoided if the project is implemented, alternatives to the project, and mitigation measures that "must be implemented to assure meeting standards of the region." Compact, Art. VII(a)(2).

On December 12, 2012, TRPA certified the Final EIS for the Regional Plan Update ("RPU") and approved the RPU. PRUDF ¶ 1. Key components of the RPU include TRPA's adoption of a Regional Transportation Plan and the incorporation of Lake Tahoe's Total Maximum Daily Load ("TMDL"). PRUDF ¶ 2. The TMDL is "a water quality restoration plan" that "quantifies the source and amount of fine sediment and nutrient loading from various land-uses and outlines an implementation plan to achieve . . . existing water quality standards." PRUDF ¶ 52. Plaintiffs and Defendant characterize the RPU differently. Plaintiffs contend that the RPU's "central strategy . . . is to loosen development restrictions and incentivize redevelopment in urban core areas, while removing existing development in sensitive outlying areas, on the theory that this would enable more environmentally sensible development and land-use overall." Plaintiffs' Statement of Undisputed Facts ("PSUF") (Doc. #25-2) ¶ 33. Defendant contends that the RPU "achieves Threshold Standards by incorporating contemporary planning principles, current science, and . . . focusing on redevelopment incentives to convert substandard legacy development into modern, environmentally beneficial, visually attractive, walkable, bikeable communities." Def.'s Cross-Mot. at 5. Defendant emphasizes "TMDL's science-based regulatory approach," rather than the 1987 Plan's focus on limiting "impervious surface coverage." Id.

On February 11, 2013, Plaintiffs filed their Complaint (Doc. #1) in this Court. The Complaint includes the following causes of action: (1) "Delegation of TRPA's project approval and review duties in violation of the Compact;" (2) "Failure of Regional Plan to establish and ensure compliance with minimum regional standards;" (3) "Failure to properly make threshold findings pursuant to the Compact and Code sections 4.5 and 4.6;" and (4) "Failure to adequately analyze significant impacts in violation of the Compact." In a June 14, 2013 Order (Doc. #18), the Court dismissed Plaintiffs' state law claims with prejudice and dismissed Plaintiffs' first cause of action without prejudice, on ripeness grounds.

## II.  LEGAL STANDARDS

### A.  Standard of Review

Under the Compact, the standard of review for legislative actions is "whether the act or decision has been arbitrary, capricious, or lacking substantial evidentiary support or whether the agency has failed to proceed in a manner required by law." Compact, Art. VI(j)(5). Review under the Compact largely mirrors review of agency action under the Administrative Procedure Act ("APA"). League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, 739 F. Supp. 2d 1260, 1267 (E.D. Cal. 2010) aff'd in part, vacated in part, remanded, 469 F. App'x 621 (9th Cir. 2012).

Under the APA, an agency decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(s)(A).

4

"Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1156 (9th Cir. 2006). Rather, the Court "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, has entirely failed to consider an important aspect of the problem, or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Id.

The National Environmental Policy Act ("NEPA") does not directly apply to TRPA. See Glenbrook Homeowners Ass'n v. Tahoe Reg'l Planning Agency, 425 F.3d 611, 615 (9th Cir. 2005) (explaining that NEPA regulations do not apply to the Compact). However, cases interpreting NEPA may "inform interpretation of the Compact . . . where those cases rest on language analogous to that used in the Compact." League to Save Lake Tahoe, 739 F.Supp.2d at 1274. Similarly, cases interpreting the California Environmental Quality Act ("CEQA") may provide persuasive authority. See League to Save Lake Tahoe, 739 F.Supp.2d at 1276 (noting that "like CEQA and NEPA, the Compact serves to inform the public and to protect the environment in a general sense").

B.   Disposition at the Summary Judgment Stage

Rule 56(a) of the Federal Rules of Civil Procedure ("FRCP") provides that "a court shall grant summary judgment if the movant shows there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." A factual issue is "genuine" when the evidence is such that a reasonable

5

jury could return a verdict for the non-moving party. <u>Villiarmo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002).

In this case, each party submitted its own statement of undisputed facts as well as a response to the opposing party's statement of undisputed facts. However, both parties agree that disposition at the summary judgment stage is appropriate, given that this is an administrative record case. The parties disagree on which legal conclusions should be drawn from the administrative record, but do not dispute the administrative record itself. Therefore, disposition at the summary judgment stage is appropriate.

    C.   <u>Judicial Notice</u>

Plaintiffs request judicial notice of several documents related to the Douglas County South Shore Area Plan, all of which post-date the approval of the RPU. (Doc. #26, 40). As this case concerns whether TRPA's decision to approve the RPU was supported by the administrative record, the post-dated documents are not relevant. <u>League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency</u>, 739 F. Supp. 2d 1260, 1264 n.1 (E.D. Cal. 2010) <u>aff'd in part, vacated in part, remanded,</u> 469 F. App'x 621 (9th Cir. 2012) (declining to take judicial notice of post-dated documents in an administrative record case); <u>see</u> <u>also</u>, <u>Rybachek v. U.S. Envtl. Prot. Agency</u>, 904 F.2d 1276, 1296 (9th Cir.1990) (noting that it is not "appropriate . . . to use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision"). Accordingly, Plaintiffs' requests for judicial notice of all post-dated documents relating to the Douglas County South Shore Area Plan are denied.

1    Plaintiffs also request judicial notice of the California
2 Air Resources Board's ("CARB") 2011 "Amendments to the Area
3 Designations for State Ambient Air Quality Standards."  (Doc.
4 #26).  Plaintiffs note that this document demonstrates "CARB's
5 redesignation of the Tahoe Basin as 'nonattainment transitional'
6 for ozone pollution."  Pls.' Reply to Def.'s Opp. to RJN at 3
7 (Doc. #42).  The Ninth Circuit has held that, in an
8 administrative record case, review of extra-record materials is
9 only appropriate if "necessary to explain agency decisions."  Sw.
10 Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d
11 1443, 1450 (9th Cir. 1996).  As acknowledged by Plaintiffs, the
12 Draft EIS "specifically references" CARB's designation of the
13 region as "nonattainment transitional."  AR11759.  As the
14 information in the proffered document "can be extracted from the
15 record," judicial notice is not necessary.  Sw. Ctr. for
16 Biological Diversity, 100 F.3d at 1450-51.  Accordingly,
17 Plaintiffs' request for judicial notice of the CARB document is
18 denied.

19    The Nevada Department of Conservation and Natural Resources
20 (one of the amici) also requests that the Court take judicial
21 notice of a December 19th, 2013 Proclamation by the Nevada
22 Governor.  (Doc. #47).  As this document post-dates the approval
23 of the RPU, the request for judicial notice is denied for the
24 reasons discussed above.  League to Save Lake Tahoe, 739
25 F.Supp.2d at 1264 n.1 (declining to take judicial notice of post-
26 dated documents in an administrative record case).

27
28

1                          III.  OPINION

2        The parties raise four basic issues in their respective
3   motions for summary judgment, which focus on TMDL and
4   concentrated coverage, soil conservation, BMPs, and the ozone
5   threshold.  Each is discussed in turn. The Court finds in favor
6   of Defendant on all four issues as explained below.

7        A.    TMDL and Concentrated Coverage

8        Plaintiffs argue that TRPA's failure to analyze the impacts
9   of concentrating impervious coverage was arbitrary and
10  capricious.  Pls.' Mot. at 7.  Defendant argues that the RPU's
11  shift to the TMDL model was supported by substantial evidence and
12  is entitled to deference.  Def.'s Cross-Mot. at 8.

13       The RPU emphasizes the TMDL model, and moves away from the
14  "Bailey" model, which was implemented by the 1987 Regional Plan.
15  PRUDF ¶ 2.  The Bailey model, named after its author, focuses on
16  limiting impervious surface coverage (i.e., concrete, asphalt,
17  etc.) in the Lake Tahoe region.  Pls.' Mot. at 8.  The Bailey
18  approach imposes strict limits on the percentage of area coverage
19  allowed on nine different soil types, depending on their
20  "capability" rating.  Id.  In contrast, the TMDL model aims to
21  reduce the total flow of pollutants into Lake Tahoe, and rejects
22  the Bailey model's strict limits on impervious surface coverage.
23  PRUDF ¶ 52.

24       Plaintiffs first argue that TRPA's failure to conduct a
25  watershed-level analysis on the effect of geologically-
26  concentrated coverage was arbitrary and capricious.  Pls.' Mot.
27  at 9.  Plaintiffs contend that substantial evidence exists in the
28  administrative record that concentrating coverage in single

                                   8

watershed areas is environmentally harmful, even if region-wide total coverage does not increase. Pls.' Mot. at 11. Plaintiffs argue that a watershed-level analysis of concentrated coverage was feasible and that TRPA's decision to conduct only a region-wide study was unreasonable. Pls.' Mot. at 12. Defendant responds that watershed-level analyses were not feasible, and that it created and studied a Center-level model in response to Plaintiffs' concerns. Def.'s Cross-Mot. at 9. Defendant also maintains that it is entitled to substantial deference in choosing the methodology for its environmental studies. Def.'s Cross-Mot. at 10.

The Court must be "at its most deferential" when reviewing "scientific judgments and technical analyses within the agency's expertise." Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012). The Court is "not . . . to decide whether an EIS is based on the best scientific methodology." Alaska Survival v. Surface Transp. Bd., 705 F.3d 1073, 1088 (9th Cir. 2013). Accordingly, the Court must be "at its most deferential" in reviewing TRPA's scientific methodology, including the scope and scale of its studies. Native Ecosystems Council, 697 F.3d at 1051.

TRPA's decision to use the TMDL model rather than the Bailey model was an exercise of its scientific expertise. Although Plaintiffs may prefer the Bailey model of coverage-based limitations, Defendant's choice of the TMDL model is supported by substantial evidence in the administrative record and addresses Plaintiffs' concerns over concentrated coverage. See AR128193 (Tahoe Basin Impervious Coverage Study's finding that

9

1  "concentrating development and limiting the development footprint
2  has the potential to reduce . . . environmental impact").
3  Moreover, the Final EIS included a lengthy explanation of why
4  watershed-level analyses were neither feasible nor necessary.
5  AR5089-96.  TRPA conducted extensive scientific studies under the
6  TMDL model, and an agency is not required to address "every
7  possible scientific uncertainty."  N. Plains Res. Council, Inc.
8  v. Surface Transp. Bd., 668 F.3d 1067, 1085 (9th Cir. 2011).  In
9  response to public comments by Plaintiffs, the Final EIS included
10 a Pollutant Load Reduction Model ("PLRM") which "provided
11 estimates of existing and future pollutant loading from areas
12 designated as "Centers" in the RPU.  PRUDF ¶ 142.  Although not
13 on the exact scale requested by Plaintiffs, the PLRM simulation
14 represents an effort by TRPA to address Plaintiffs' concerns
15 about localized concentration of coverage.  AR5103 (Final EIS).
16 For these reasons, the cases cited by Plaintiffs, in which
17 agencies conducted little or no environmental review, are not
18 applicable.  Pls.' Mot. at 9, 13 (citing N. Plains Res. Council,
19 668 F.3d at 1079 and Kern v. U.S. Bureau of Land Mgmt., 284 F.3d
20 1062 (9th Cir. 2002)).

21      Furthermore, the region-wide scale of the TMDL model is
22 consistent with the regional scale of the RPU itself.  "The
23 degree of specificity required in an [Environmental Impact
24 Report] will correspond to the degree of specificity involved in
25 the underlying activity which is described in the EIR."  Sierra
26 Club v. Tahoe Reg'l Planning Agency, 916 F. Supp. 2d 1098, 1154
27 (E.D. Cal. 2013); see also, State of Cal. v. Block, 690 F.2d 753,
28 761 (9th Cir. 1982) (noting that the degree of detail required

10

"in an EIS depends upon the nature and scope of the proposed action"). As the RPU is a region-wide plan, TRPA's decision to temporarily defer a site-level analysis was reasonable. <u>Friends of Yosemite Valley v. Norton</u>, 348 F.3d 789, 800 (9th Cir. 2003) (an EIS for a program-wide plan must provide "sufficient detail to foster informed decision-making," but "site-specific impacts need not be fully evaluated" until site-level projects are proposed). Under the RPU, "smaller-scale planning efforts would require additional environmental analysis, including evaluation of coverage at a more localized scale." AR5090 (Final EIS). Such local-level analyses would occur "in response to proposals for implementing programs or specific development or public works projects." AR11550 (Draft EIS).

Plaintiffs' reliance on TRPA's prior practices, which acknowledged the potential harm of concentrating coverage, is unpersuasive. Pls.' Mot. at 11. Plaintiffs note that TRPA's 1988 and 1989 Water Quality Management Plans "recognize[e] the potential harm that can be caused by concentrating coverage" and emphasize the importance of preventing "any given . . . geographic subregion from absorbing a disproportionate amount of . . . land coverage." Pls.' Mot. at 11 (citing AR2070 and AR141391). However, as Defendant notes, these documents are 25 years old and were written prior to "the advent of the TMDL." Def.'s Cross-Mot. at 11.

Plaintiffs' argument that "TMDL compliance is not mandatory in Nevada" is misguided. Pls.' Reply at 6. The federal Clean Water Act ("CWA") requires that Nevada "have a continuing planning process" to meet its obligations under the TMDL model.

33 U.S.C. § 1313(e). If Nevada fails to meet its TMDL obligations, the Environmental Protection Agency is authorized by the CWA to establish, and enforce, its own TMDL standard in Nevada. Food & Water Watch v. United States Envtl. Prot. Agency, 2013 WL 6513826, at *2 (D.D.C. Dec. 13, 2013). Accordingly, Nevada's reliance on non-binding Memoranda of Agreement to implement the TMDL does not affect its statutory obligations under the CWA, and does not call into question the RPU's reliance on the TMDL.

      B.    <u>Soil Conservation</u>

A second argument put forth by Plaintiffs is that the EIS "failed to examine the cumulative impacts to soil conservation resulting from increased development and concentrated coverage in centers." Pls.' Mot. at 7. Defendant's initial response to this contention raises a procedural defense that Plaintiffs failed to raise a "soil conservation argument" in their opening brief, and are, therefore, prohibited from raising it for the first time in their reply brief. Def.'s Reply at 2. However, in addition to the claim quoted above, Plaintiffs' opening brief contains an extensive discussion on TRPA's responsibility to meet the "soil conservation threshold," which protects "soil and ecological balance." Pls.' Mot. at 8. Similarly, Defendant argues that Plaintiffs failed to exhaust their administrative remedies, as the argument was never raised during the administrative process. Def.'s Reply at 2. However, Plaintiffs submitted public comments in response to the Draft EIS expressing concern that failure to adhere to soil conservation thresholds could disrupt the "ecological balance" of the LTAB region and result in "vegetative

1   disturbance" and "ecologic damage."  AR4473 (Final EIS).
2   Accordingly, Plaintiffs are not procedurally barred from raising
3   this argument.
4        Nonetheless, Plaintiffs' contention that the EIS failed to
5   address soil conservation concerns is not supported by the
6   record.  The Draft EIS concluded that the RPU would result in
7   improvements in "soil conditions" as well as "habitat for
8   vegetation and wildlife."  AR12038.  Similarly, the Draft EIS
9   concluded that the RPU would not have a significant effect on
10  native vegetation growth, noting that "common plant . . . species
11  are relatively abundant locally and regionally and are not
12  considered limited by the availability of habitat" in the LTAB
13  region.  AR12050.  Although TRPA's discussion of the RPU's soil-
14  related impact is not as thorough as that of water-quality
15  impact, this is consistent with the fact that the vast majority
16  of comments, throughout the administrative process, focused on
17  RPU's potential impact on water-quality.  TRPA's conclusion that
18  the RPU would not have a significant effect on LTAB soil
19  conditions is supported by the record.
20       To the extent that Plaintiffs' soil conservation argument
21  depends on TRPA's failure to study the effects of concentrated
22  coverage on a watershed-level scale, this argument fails for the
23  reasons discussed above.  Supra at II(D)(1)(b).  TRPA is entitled
24  to substantial deference in selecting the methodology and scale
25  of its environmental studies.  Native Ecosystems Council v.
26  Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012).
27       C.   BMPs
28            Plaintiffs contend that TRPA's conclusion that the RPU will

13

1  not significantly affect water quality is arbitrary and
2  capricious due to its reliance on BMPs.  Pls.' Mot. at 15.
3  Plaintiffs note the historical lack of success in BMP
4  implementation and maintenance.  Id.  Defendant responds that the
5  RPU includes a number of provisions that will result in
6  widespread implementation of new BMPs and more effective
7  maintenance of existing BMPs.  Def.'s Cross-Mot. at 13.
8     BMPs, or "best management practices," are defined as
9  "alternative structural and non-structural practices proven
10 effective in erosion control and management of surface runoff."
11 PRSUF ¶ 159.  There are two categories of BMPs: (1) BMP Retrofits
12 and (2) BMPs for new development or redevelopment.  PRSUF ¶ 163.
13 The BMP Retrofit Program is a "nonpoint source pollution control
14 program" which is codified in the TRPA Code of Ordinances and
15 requires all existing past development to retrofit the site with
16 water-quality BMPs.  PRSUF ¶ 162.  Under the RPU, any new
17 development must install and maintain BMPs as a condition of
18 project approval.  PRSUF ¶ 163.  The TMDL approach proposed by
19 the RPU identifies BMPs as one of several key strategies to
20 attain pollutant load reduction goals.  PRSUF ¶173.
21    According to Plaintiffs, the RPU's reliance on BMPs is not
22 warranted given the "history of neglected BMP maintenance."
23 Pls.' Mot. at 20.  However, Plaintiffs' emphasis on maintenance
24 overlooks the distinction between BMP Retrofits and BMPs for new
25 development.  It is undisputed that, under the RPU, any new or
26 redevelopment must install and maintain BMPs as a condition of
27 project approval.  PRSUF ¶ 163.  Moreover, it is further
28 undisputed that the RPU will increase the installation of BMPs.

14

PRSUF ¶ 184. Ample evidence exists in the record that the mere installation of BMPs at the onset of a development project could dramatically reduce pollutant loads. AR128167-68 (data showing significant difference in runoff and fine sediment particle loading between building units with BMPs and those without BMPs). Once installed, many BMPs – such as retaining walls, terracing, and water spreading BMPs – can remain effective without regular maintenance. AR127031, 127024, 126991.

Plaintiffs' reliance on the past failures of BMPs also overlooks the RPU's inclusion of programs designed to incentivize and improve the maintenance of BMPs. For example, under the TMDL model, credits to an urban jurisdiction for implementing BMPs may not be awarded "without evidence that expected conditions *are being maintained*." AR107727 (2011-09 TMDL Lake Clarity Crediting Program Handbook). Likewise, the RPU will "encourage the use of area-wide [water] treatment facilities" which are expected to result in "more efficient maintenance practices relative to conducting maintenance activities on many smaller and widely distributed individual parcels and sites." AR5189-90 (Final EIS). Moreover, the RPU would "prioritize BMP Implementation in areas that achieve the greatest load reduction," which would accelerate improvements in water quality in a more cost-effective manner. AR26253.

Under the TRPA Code of Ordinances, BMP maintenance is mandatory. AR1089 (Code § 60.4.9). Under the RPU, "a BMP inspection and maintenance plan will be required" for any new project that is granted a permit. AR126934 (BMP Handbook). TRPA was entitled to conclude that its mandatory, incentivized BMP

ordinance would be largely followed.  See Towards Responsibility In Planning v. City Council, 200 Cal.App.3d 671, 680 (1988) (noting that the creator of an EIR "is not obliged to speculate about effects which might result from violations of its own ordinances").  The Ninth Circuit has repeatedly upheld agencies' use of BMPs to address potential environmental impacts.  See Hapner v. Tidwell, 621 F.3d 1239, 1246 (9th Cir. 2010) (citing agency's use of BMPs to minimize soil disturbance during logging operations); Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1015 (9th Cir. 2006) (holding that the implementation of "specific and detailed" BMPs supported the agency's finding that the project's effect on wildlife and watershed would not be significant).  Plaintiffs' attempt to distinguish these cases, on the grounds that they did not involve "evidence of past history of noncompliance," is unsuccessful.  Pls.' Reply at 3.  As discussed above, TRPA expressly acknowledged past failures in maintenance, and incorporated that experience into updated BMP guidelines.

    D.    Ozone Threshold

Plaintiffs' final contention in support of their motion herein is that TRPA's conclusion that the RPU will attain and maintain the ozone threshold, as required by the Compact, is arbitrary, capricious and lacking substantial evidentiary support.  Pls.' Mot. at 21.  Defendant responds that its conclusion that the RPU will attain and maintain the ozone threshold is supported by substantial evidence.  Def.'s Cross-Mot. at 19.

Ozone is a pollutant that forms when precursor gases react

in sunlight. PRSUF ¶ 190. The federal government, California, and Nevada have all adopted ozone standards. PRSUF ¶ 190. Under the Compact, TRPA is required to "provide for attaining and maintaining" the most stringent of these standards. Compact, Art. V(d). TRPA found that the Regional Plan, as amended by the RPU, will achieve and maintain the ozone threshold. PRSUF ¶ 216. In evaluating air quality in the LTAB region, TRPA relies on four data sets called "Threshold Indicators." PRSUF ¶ 194. The Final EIS concluded that each of these four Threshold Indicators was "in attainment" with the most stringent applicable state or federal standard. AR5238.

Plaintiffs object to TRPA's finding with regard to one of these Threshold Indicators: the highest 8-hour average concentration of ozone. Pls.' Mot. at 21. Plaintiffs note that the Draft EIS designated the LTAB region as "nonattainment-transitional" with regard to the "8-hour average," and concluded that progress toward meeting the California standard is "somewhat worse than target." AR11759 (Draft EIS). However, the subsequent 2011 Threshold Evaluation Report ("TER") concluded that the region was "currently in attainment" with the "8-hour average" threshold. AR97. Plaintiffs contend that this reversal came "with no explanation." Pls.' Mot. at 23.

In fact, the shift from "nonattainment-transitional" to "currently in attainment" is explained by the incorporation of additional data into the 2011 TER – data that was unavailable at the time that TRPA published the Draft EIS. AR97. This new data showed that, in 2010 and 2011, maximum 8-hour average ozone concentration had been measured at a level below the California

limit.  Id.  Accordingly, the Board concluded, with "moderate" confidence, that the LTAB region was in attainment with the "8-hour average" ozone Threshold Indicator.  AR5238 (Final EIS).

Plaintiffs argue that the new data should not have been incorporated into the 2011 TER because it was obtained from a monitoring station located in Nevada, rather than California.  Pls.' Mot. at 23.  Plaintiffs state that "past monitoring has shown that ozone concentrations can vary significantly around the region" and, in support of this proposition, cite a table of raw data, showing ozone measurements at different locations.  Pls.' Mot. at 24 (citing AR147415).  However, TRPA concluded that "little variation" is seen between the California and Nevada monitoring sites, and that "[b]oth stations showed similar concentrations and number of exceedance days during 2008-2010."  AR3566 (Final EIS).  The Court's expertise does not lie in advanced statistical analysis, and, therefore, the Court defers to TRPA's judgment that variability between sites is low enough to use Nevada data in the 2011 TER and the Final EIS.  Such deference is particularly appropriate where the determination "requires a high level of technical expertise."  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377 (1989).

Plaintiffs argue that this data shortage is emblematic of a wider deficiency in TRPA's monitoring program.  Pls.' Mot. at 23.  Plaintiffs note that the 2011 TER acknowledges that "the spacing and density of monitoring sites is insufficient."  Id. (citing AR82).  Plaintiffs also cite a number of instances in which TRPA acknowledges that the limitations on monitoring reduce the "confidence" with which the agency can make its findings.  Pls.'

18

Mot. at 23. However, complete certainty on the agency's part is not required. <u>N. Coast Rivers Alliance v. Marin Mun. Water Dist. Bd. of Directors</u>, 216 Cal.App.4th 614, 640 (2013) (noting, in a CEQA case, that an agency need not analyze "all information available on a subject;" the mere fact that more information "might be helpful does not make it necessary" that the agency consider it). Moreover, the 2011 TER merely acknowledges that "spacing and density of monitoring sites is insufficient *to know the extent of how maximum and minimum pollutant concentrations are distributed throughout the basin*." AR82 (emphasis added). These limitations were taken into account by the "moderate" confidence level with regard to the attainment of California's 8-hour ozone standard, as expressed in the 2011 TER. AR97. These peer-reviewed findings constitute substantial evidence on which TRPA could base its wider approval of the RPU. (Although Plaintiffs note that, unlike the Draft EIS, the 2011 TER was not peer-reviewed, the statistical methodology used in both reports was peer-reviewed along with the Draft EIS.)

Moreover, TRPA was not required to make a finding that the LTAB region is currently in attainment of all threshold standards. <u>Sierra Club v. Tahoe Reg'l Planning Agency</u>, 916 F. Supp. 2d 1098, 1145 (E.D. Cal. 2013). Rather, it was required to find that the RPU implements a plan that will achieve and maintain those thresholds. <u>Id.</u> at 1145. TRPA partially relied on the region's current attainment of the thresholds in making that finding. However, TRPA also relied on a number of other factors. Def.'s Cross-Mot. at 24. First, it noted that air quality in the LTAB region is consistently improving, due to

increasingly stringent vehicle emission standards.  AR26683.
Second, the RPU implements a number of programs and policies
designed to "reduce dependency on the automobile by making more
effective use of existing transportation modes and of public
transit."  Compact, Art. V(c)(2)(A).  Among other things, the RPU
provides incentives for the creation of non-motorized trails, the
removal of non-compliant emission sources, and enhanced
pedestrian, bicycling, and public transit opportunities.
AR26684-85.  As high ozone levels are largely tied to vehicle
emissions, these changes provide additional support for TRPA's
finding that the RPU will achieve and maintain air quality
thresholds.  Substantial evidence supported TRPA's conclusion
that the Regional Plan, as amended by the RPU, will achieve and
maintain the ozone threshold.

## IV.  ORDER

For all the foregoing reasons, the Court DENIES Plaintiffs' Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment:

IT IS SO ORDERED.

Dated:  April 4, 2014

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE